**QUEBECOR PRINTING CORPORATION**

v.

**L & B MANUFACTURING COMPANY, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Feb. 9, 2006 Session.

May 23, 2006.

Permission to Appeal Denied by Supreme Court Nov. 13, 2006.

David W. Blankenship, Kingsport, Tennessee for the Appellants, L & B Manufacturing Company and Mac Manufacturing, Inc.

Robert L. Arrington, Kingsport, Tennessee for the Appellee, Quebecor Printing Corporation.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Quebecor Printing Corporation ("Plaintiff") entered into a contract with L & B Manufacturing Company ("Defendant") to purchase a machine ("the Machine"). A dispute arose after Defendant delivered the Machine to Plaintiff and Plaintiff had paid the majority of the purchase price, but before the Machine was set-up for use in production. Plaintiff and Defendant hired attorneys and entered into a second contract ("Settlement Agreement") intending to settle their differences. Disputes arose in connection with the Settlement Agreement and Plaintiff sued Defendant seeking, in part, a refund of the money paid for the Machine. After a bench trial, the Trial Court held, *inter alia*, that the parties had entered into the Settlement Agreement and had undertaken to perform that agreement thereby extinguishing the underlying agreement for the purchase of the Machine; that Plaintiff was entitled to a judgment against Defendant in the amount of $75,000, which was the purchase price of the Machine; that Plaintiff had breached its duty as a bailee of the Machine entitling Defendant to an offset against the judgment for damage to the Machine while in Plaintiff's possession; and that this offset was to be decreased by $5,000, which was the uncontested amount of damages caused to the Machine by Defendant prior to Plaintiff's storage of the Machine. After additional hearings, the Trial Court entered an order finding and holding, *inter alia*, that Plaintiff was responsible for $10,000 of damages to the Machine, to be reduced by the $5,000 worth of uncontested damages as previously ordered resulting in a net judgment of $70,000. The Trial Court declined to award Plaintiff its discretionary costs. Defendant appeals raising issues regarding the interpretation of the Settlement Agreement, the amount of damages, and the exclusion of evidence. Plaintiff argues the Trial Court erred in not awarding discretionary costs. We reverse as to the issue of discretionary costs, modify the judgment to hold that Defendant is entitled to the Machine and to have the Machine shipped to Defendant at Defendant's expense, if Defendant so chooses, and we affirm the remainder of the judgment as so modified.

### Background

Plaintiff is a printing business which produced Bibles, among other things, at its Sherwood Road plant. Defendant, who had a previous business relationship with Plaintiff, submitted to Plaintiff a proposal to design and manufacture a machine that would mechanically feed the paper sections, also known as signatures, that Bibles are made of into a sewing machine for assembly into a finished product. The paper or stock used to print Bibles is lightweight because Bibles contain a large number of pages. Lightweight paper is more difficult than heavier paper to feed into a sewing machine. At the time that

Defendant made its proposal, Plaintiff was using individual operators who would hand-feed the signatures into the sewing machine and the repetitive motions of hand-feeding were causing injuries such as carpal tunnel. Plaintiff and Defendant entered into a contract for Defendant to produce the Machine utilizing, among other parts, a used sewing machine provided by Plaintiff, for a cost to Plaintiff of $75,000.

Defendant built the Machine and shipped it to Plaintiff's Sherwood Road plant where Bill McFarland, one of the Machine's designers, began to install or set-up the Machine. At that time, Plaintiff had paid Defendant $60,000 of the $75,000 price of the Machine. Problems arose during set-up and, as a result, the parties hired attorneys, Plaintiff filed suit, and the parties began to negotiate. After extensive negotiations, the parties entered into the Settlement Agreement.

In pertinent part, the Settlement Agreement provides:

NOW THEREFORE, in consideration of the mutual covenants contained herein, same being deemed adequate consideration, the parties hereto agree and have agreed as follows:

1. Within seven (7) days of the effective date of this Agreement, [Plaintiff] will ship to [Defendant] samples of each type of book stock which [Plaintiff] desires to run on the sewing machine in question along with said machine.

2. [Defendant] will then have seven (7) days from the date of receipt of said sample of book stock within which to determine whether or not it can make its automatic feeder, attached to [Plaintiff's] sewing machine, feed the various types of book stock which [Plaintiff] has supplied as samples;

3. [Defendant's attorney] will inform [Plaintiff's attorney] if, at the end of the seven (7) day period described in Section 2 above, [Defendant] has the ability to make the improvements to the sewing machines necessary to allow the MAC automatic feeder feed the various types of book stock as required by [Plaintiff]. If [Defendant's attorney] informs [Plaintiff's attorney] that [Defendant] does have said ability, [Plaintiff] will ship its sewing machine to [Defendant] at [Defendant's] expense, and [Defendant] will have one hundred twenty (120) days within which to complete its work on the machine.

4. If, after said one hundred twenty (120) days, the MAC feeder/sewer will not process the range of book stock desired by [Plaintiff], or otherwise, is not acceptable, then [Defendant] will pay back or refund to [Plaintiff] the $60,000.00 which [Plaintiff] has previously paid to [Defendant] for the feeder/sewer modifications. If [Defendant] is required to make said payback or refund it shall be entitled to keep the feeder/sewer.

As per the Settlement Agreement, Plaintiff sent samples to Defendant. Defendant ran the samples and then Defendant's attorney sent Plaintiff's attorney a letter along with a page detailing Defendant's comments regarding the running of the provided samples. The letter from Defendant's attorney stated, in pertinent part: "In general, the comments are favorable, and there should not be a problem moving to the next step of the Settlement Agreement once the issues raised herein are discussed." The page detailing Defendant's comments regarding the samples stated, in pertinent part:

SAMPLE 1 ... paper type, weight and format do not pose a problem—sample did not include endpapers

SAMPLE 2 ... paper type, weight and format do not pose a problem—sample did not include endpapers

SAMPLE 3 ... sample did not include endpapers—4 page map will not run in this format

Recommendation: tip on map

SAMPLE 4 ... sample did not include endpapers—glossy sheets will cause a problem and will not run in this format

Recommendation: tip on glossy sheets

\* \* \*

SAMPLE 5 ... this is the same sample as Sample # 4

SAMPLE 6 ... will run consistently

SAMPLE 7 ... sample did not include endpapers

8 page (i.e. pg. 994) will pose a problem and will not run in this format

Recommendation: change format of this page

Many of the samples did not include endpapers which are necessary to review the samples. We need enough samples to test on the machines to give an accurate and confirmed rating of each sample.

Plaintiff received a copy of the letter from Defendant's attorney and the page of Defendant's comments and initiated no further contact with Defendant until after the 120 day period provided for in the Settlement Agreement had expired. Plaintiff then requested a refund of the money paid for the Machine. During the time between Plaintiff's receipt of Defendant's comments and the end of the 120 day period, Defendant made various proposals seeking to modify the Machine so that it would run only some heavier weight Bible stock. These proposals were rejected by Plaintiff. The parties also attempted to negotiate a second settlement agreement, but never arrived at another agreement.

Several weeks after the 120 day period had expired, Plaintiff demanded repayment of the purchase price of the Machine under paragraph 4 of the Settlement Agreement. Defendant responded to the demand for repayment with a letter stating that Plaintiff had failed to comply with the Settlement Agreement, in part, by not providing adequate samples, by not shipping the Machine to Defendant, and by not communicating with Defendant regarding the recommendations suggested by Defendant for running the samples. The case proceeded to trial.

The case was tried without a jury in August of 2002. At the beginning of the trial, the parties made the following stipulations:

**[Plaintiff's attorney]:** Your Honor, we can stipulate that—that, you know, we did reach an agreement on the terms and conditions of a settlement agreement. ... What—what happened after the parties reached agreement on the terms and conditions, whether or not the terms and conditions of the settlement agreement itself were complied with by the parties is an issue.

And really there's one other thing in that settlement agreement I think that we can certainly stipulate and that is there is an ambiguity in the settlement agreement itself as to when this machine was supposed to have been shipped to [Defendant] by [Plaintiff]. There was a sequence of events that was to occur as part of this settlement agreement. I think we can agree the parties at least understood that [Defendant] had to make some statement relative to some samples it was going to run before the machine was to be shipped, is that correct?

**[Defendant's attorney]:** That's right.

[Plaintiff's attorney]: I think we—we've gone through that.

**The Court:** All right. All right.

[Plaintiff's attorney]: So we can—we can stipulate that the parties reached an agreement as to the terms and conditions of a settlement agreement, at least one. And—and secondly, we can—we can stipulate that under the sequence of events that occurred under that initial settlement agreement that the machine was not supposed to be shipped to South Carolina to [Defendant's] facility until [Defendant] had run some samples and—and had—their lawyer had made a report to me.

**The Court:** Is that stipulated?

[Defendant's attorney]: That's stipulated, Your Honor. That's—that's in Paragraph 3 of the settlement agreement.

Fred Cooper, vice president and division manager for Plaintiff during the relevant time period involved in this suit, testified at trial. Mr. Cooper testified that Plaintiff initially paid Defendant $60,000 of the purchase price for the Machine and then in April of 2000, Plaintiff's accounting department made a mistake and paid Defendant the remaining $15,000 of the purchase price, despite the pending lawsuit.

Mr. Cooper testified about Defendant's comments and recommendations regarding the samples provided by Plaintiff. Mr. Cooper testified that as per those comments and recommendations, sample 3 stated there was an issue with a four-page map and recommended they tip-on, or glue, the map and Plaintiff interpreted this as an unsuccessful run. Mr. Cooper testified that Defendant's comments regarding sample 4 stated that the glossy sheets would not run and the comments regarding sample 5 stated it was the same as sample 4. Plaintiff reasonably interpreted Defendant's comments regarding samples 4 and 5 to mean that these runs also were unsuccessful. Mr. Cooper testified that Defendant's comments regarding sample 7 raised an issue about an 8-page signature that would not run and recommended that Plaintiff change the format. Mr. Cooper testified that changing the format was not a viable option as it would require "restripping, impositions, additional paper to the customer, additional processes throughout the plant and by and large Bible customers dictate the imposition and the format that they want these Bibles run in." Mr. Cooper testified: "There's nothing here [in Defendant's report] to indicate that he had the ability to [run the work as promised]. It was unsuccessful. ... It's unacceptable." Mr. Cooper further testified that "under the terms of our settlement agreement, unless [Defendant] had the ability to do everything that we sent him, then we weren't under any obligation to—to contact him again. It was—the ball was in his court and he was to come back to us."

Bill McFarland, one of the Machine's designers, testified regarding Defendant's run of the samples provided by Plaintiff pursuant to the Settlement Agreement. Mr. McFarland testified that the only problems Defendant encountered when running the samples were the tip-ons and the end papers, but that in general Defendant could run the work. Mr. McFarland testified that some time in October of 1999, after Defendant ran the samples, he received a call from Mr. Cooper asking what was going on. Mr. McFarland testified that when he told Mr. Cooper that Defendant still was waiting for the Machine, Mr. Cooper was surprised and said he would look into it.

Mr. McFarland testified that sometime after his October 1999, conversation with Mr. Cooper, he was contacted by someone from one of Plaintiff's other facilities asking if Defendant would like to purchase

surplus machinery. As Defendant was interested in such a deal, Mr. McFarland made an appointment and went to look at the surplus machinery in February of 2002. Mr. McFarland testified that he met a representative of Plaintiff's other facility and after viewing machinery in several of Plaintiff's warehouses:

> we proceeded to the other warehouse which was—as he explained to me, used to be a tobacco warehouse. It had no lighting. It—it was very dark in there. It happened to be raining this day that I was there and noticed that the roof had been leaking and water was on the floor in various spots in—in this place. And as we were walking through and looking at different machinery I noticed the box of the machine because it had a big pink shipping thing on the side that said, "Attention: Bill McFarland, Mac Manufacturing." It had my name on it so of course, I looked at it. The side of the box had been crashed in. And I looked inside of it and I noticed that was the machine. And the top of the crate had been smashed in too, by the way. . . . But the roof had been leaking and water was entering in from the roof. The water had been on top of the crate in the forward part where it was bashed in and running underneath the crate. And I was somewhat surprised that the machine would be in this environment. . . . Well, because it leads for a very serious condition on the machine. Water, machinery and electronics do not mix.

Mr. McFarland testified regarding the damage to the Machine stating: "the saddle plates that have been ceramic coated are bent over. And the roof, the front portion of the roof—I say 'front' because the machine is loaded this way with the front—the front of the machine facing this way, has collapsed." He further testified there was evidence of corrosion damage to the Machine and stated that "some of this corrosion is actually pitted into the material. It's not just surface corrosion." However, Mr. McFarland admitted that he did not see any damage to the crate that the automatic feeder was in and that the crate containing the sewing machine was damaged only at one end. Further, Mr. McFarland admitted that the signature found in the Machine had no evidence of mold, mildew, or moisture damage. Mr. McFarland also admitted that prior to Defendant's shipping the Machine to Plaintiff, the Machine was damaged and had to be repaired. Mr. McFarland testified that while the Machine was being prepared for shipping and was being loaded, a forklift operator hit the saddle plate while moving the Machine. Mr. McFarland testified that the repairs required as a result of this incident were minor and were completed prior to shipping the Machine to Plaintiff.

After trial, the Trial Court entered a Judgment and Order on January 6, 2003, incorporating the Trial Court's November 22, 2002 Memorandum Opinion, and finding and holding, *inter alia*, that the parties had entered into the Settlement Agreement and had undertaken to perform that agreement thereby extinguishing the underlying agreement for the purchase of the Machine; that Plaintiff was entitled to a judgment against Defendant in the amount of $75,000, which was the purchase price of the Machine; that Plaintiff had breached its duty as a bailee of the Machine entitling Defendant to an offset against the judgment for damage to the Machine while in Plaintiff's possession; and that this offset was to be decreased by $5,000, which was the uncontested amount of damages caused to the Machine by Defendant prior to Plaintiff's storage of the Machine. In its Memorandum Opinion, the Trial Court specifically found, *inter alia*, that the notification from Defendant and its attorney to Plaintiff's attorney "did not inform [Plain-

tiff's attorney] that [Defendant] had the ability to make the improvements to the sewing machine as necessary to allow the Mac automatic feeder to feed the various types of book stock as required by [Plaintiff] ...."

Regarding the amount of damages, the Trial Court stated in its Memorandum Opinion:

The Court finds the testimony of the parties unacceptable as to the amount of damage to the Defendants' machine due to the wide divergence of $5,000.00 versus in excess of $50,000.00 and upon the record as a whole; therefore, the Court directs that unless the parties are able to agree by mediation or otherwise as to the sum of damage within thirty days from the date of filing of this Memorandum Opinion, that the parties shall submit to the Court by December 23, 2002 a joint list of the names of three individuals or entities that possess the necessary qualifications to inspect the Defendants' machine and present testimony as to what sum, if any, would be necessary to restore the machine to its pre-storage condition.

In April of 2003, the Trial Court entered a Supplemental Order modifying its November 22, 2002 Memorandum Opinion to order, among other things, that each party select one expert to inspect the Machine with these two experts to be joined by Lou Senofonte as a third inspector. The Supplemental Order also provided that Mr. Senofonte's services could be dispensed with upon mutual agreement of the parties. Mr. Senofonte's services were not used.

The parties each filed motions in limine seeking to exclude specific items of evidence. The Trial Court rendered several orders excluding specific evidence and a hearing then was held in December of 2003, regarding damages to the Machine.

At the hearing, Dennis Kevin Graham testified as Defendant's expert. Mr. Graham testified that he was a former employee of Defendant, that he had rebuilt three Smyth sewers, and had been involved in the building of the Machine. Mr. Graham testified: "I was involved in the set-up, testing, videotaping and picture taking of the machine, which was due to be patented, so I was involved quite heavily." Mr. Graham testified that he worked closely with Bill McFarland on the Machine.

Mr. Graham testified that he inspected the Machine in August of 2003, after it had been in storage. Mr. Graham testified that there were two boxes, one for the sewer and one for the feeder. He testified: "The damage that I saw was that the saddle plate, from Exhibit 20, was buckled and unusable." Mr. Graham opined that the saddle assembly would need to be replaced at a cost of around $14,575. He further testified that the saddle guide mount would need to be replaced and that it could not be reworked. Mr. Graham explained:

It's very difficult to go ahead and bend that type of material back in position. You have to go ahead and consider that the Bible signature is only three thousandths thick and if you have a misalignment of a hole of twenty thousandths, then you're going to have a, a misfit of the saddle plates. So that won't go ahead and work, trying to bend it back, because you'll have it fly off.

Mr. Graham testified that the replacement cost for the saddle guide mount would be $681. Mr. Graham also testified:

there was a great deal of rust and pitting on the gears themselves as well as the bracket, the fixture that goes with it. Also, I was noticing that the bearings that go with, which can't be seen from this photo, are located in it and if you

have any kind of water intrusion on a bearing, you'll want to go ahead and replace it because with water, of course, oxidation occurs.

As a result of his examination, Mr. Graham recommended: "[c]omplete disassembly [of the Machine], evaluation of each component part, repair if necessary and replace if necessary, reassemble. Now that cost represents the tear-down and rebuild and evaluation, not replacement." Mr. Graham testified that he recommended tear-down because:

> You have a number of bearings, Sir, that in, in the machine, that if water had been introduced would cause some failure in the future and in order to remove and assume the liability, if you had to use the machine, you would want to make sure that it was in good running proper order and you would replace those items, but first you have to make the determination that they needed to be replaced. So what you would do is would tear everything down, look at it, see what kind of problems you've had from oxidation and rust, and then you would go ahead and evaluate those items that have to be replaced and then reassemble the machine.

Mr. Graham opined that the total cost for repairing the Machine would be $68,655.72.

Frank Fratturo also inspected the Machine and testified as Plaintiff's expert. Mr. Fratturo testified that he is retired from the business of repairing book binding equipment. Mr. Fratturo opined it would cost about $4,100 to repair the damage to the Machine, not counting the cost of replacing the items removed by Mr. McFarland. The items removed by Mr. McFarland constituted the $5,000 of uncontested damages as found by the Trial Court in its January 6, 2003 order. Mr. Fratturo testified that other than the bent plates, the sewer is in good condition. He testified that some of what looks like oxidation in the photographs introduced at trial actually is dust. Mr. Fratturo stated: "the pictures show, actually accent the rust more." Mr. Fratturo stated: "Even like the photograph on the, on the feeder with the programming box, by looking at the picture I thought there was a lot of damage, but when I finally got to inspect it there was, there was very little damage to it." Mr. Fratturo further explained:

> this is the programming arm ....Looking at the picture, it looked like this, this, this rod was possibly bent and if this was bent that would, that would be to me it seemed like a whole lot of damage, but upon inspection this rod wasn't bent at all. This plate was just hanging.

Mr. Fratturo testified: "I turned the sewer over by hand and it turned over very smoothly. ... So I, I wouldn't see any problem with that machine running in its state once the saddle plates were, were repaired and a few little minor things." Mr. Fratturo also testified:

> on the feeder, that box, there was nothing bent. What had happened is somebody had removed two screws on the side of it so that they could move a couple of toggle switches out of the way for the storage so they probably wouldn't break in the storage box and they didn't put the screws back on, so the only problem there is it was missing two screws, so I allowed them a dollar each for the screws and an hour's worth of labor to, to put it back together.

Mr. Fratturo testified that is all that was wrong with the feeder.

Regarding the total amount of damages, Mr. Fratturo opined:

> The grand total is four thousand, well, I also added another thousand dollars for anything they might find. Anything un-

usual they might find on the feeder or the sewer, just in case and the subtotal was three thousand, ninety and then I added a thousand as a, for anything unusual that might be found, bringing the total up to four thousand and ninety dollars.

Mr. Fratturo testified: "it seems like [Mr. Graham's] trying to rebuild and re-engineer the machine as a new machine when in fact we were only trying to estimate the cost of putting the machine back into operation as it was pre-storage." When he was asked about the photograph showing books sitting in the Machine, Mr. Fratturo testified: "Well, if the machine sewed last in '96, I would say they've been sitting there since then. ... I'm just assuming. ... [I]t would be hard for the thread to be connected through the machine like it is [otherwise]."

The parties then made an offer of proof of some of the evidence excluded by the Trial Court. During the offer of proof, Mr. McFarland testified: "the brace rod that connects the two legs, the left and right legs, has been bent or sheared." Mr. McFarland also testified regarding a cracked leg found on the Machine. Mr. McFarland testified that the Machine with a cracked leg is a total loss:

> Because I cannot reuse that machine in any way. I'd have to have that leg repaired, replaced. It would not be a proper fix to weld that leg and put it back in service. ... Because eventually that leg would more than likely crack again and I'd have to assume some liability on my part if I resold that machine to somebody else. There's also a performance factor too.

Mr. McFarland testified that the leg of the Machine was not broken prior to shipping the Machine to Plaintiff. Mr. McFarland testified that the feeder also is a loss be-

cause: "The feeder is designed and built to go with that sewing machine."

During the offer of proof, Mr. Graham testified that it appeared to him that the cracked leg had been caused by some type of force or impact and had been repainted. When he was asked about damage other than the sheared rod and the bent leg, Mr. Graham testified:

> We noted that the frame, of course, then was fractured because the leg was cracked. We noted that somebody had welded it and it had not been welded when it left our shop. We noticed that several parts had been removed from the machine that I could not inspect, were not available for me to inspect to see what type of damage had occurred or what type of wear had occurred. On the feeder I noticed some evident scratch marks. In my opinion, my professional opinion somebody had used a fork truck with no barriers in between the equipment and pushed the equipment across the floor. I noted some marks on the feeder itself and I noticed, one of the things that struck me was a large vacuum pump was missing off the feeder.

Mr. Graham further testified:

> [The Machine] was a specialized piece of equipment and I considered it a total loss. By just doing the removal and replacement it became a total loss. It wouldn't have been cost efficient. The frame was unusable and the time that it would take to salvage what few parts could be salvaged wouldn't be relevant to the salvage value. You would spend more time in labor taking them out than you would actually get back in return on the resale of that part.

Mr. Graham testified during the offer of proof that his estimate to repair both the sewer and feeder is $96,814.24, but that it is his opinion that these machines cannot

be repaired. Mr. Graham testified: "Due to the one off use of that machine, the design of the machine and the purpose of which the machine was designed for was specialized, there would be no value as far as salvage for it." Mr. Graham, however, admitted that the sewer was a used one that Plaintiff had sent to Defendant to be used in this project. When asked, Mr. Graham testified that his estimate rules out the possibility of obtaining a used frame because Mr. Graham asserted that a used frame that has not been bent cannot be found.

During the offer of proof, Brian Hill, who was a maintenance manager at Plaintiff's Kingsport facility, testified. Mr. Hill admitted that he saw the cracked leg on the day that the experts examined the Machine. Mr. Hill testified that while the Machine was stored in their warehouse around Thanksgiving "someone broke into the warehouse and did some vandalism which incurred some damage not only to the building, but also to the container that the sewer was housed in." Mr. Hill testified that after this vandalism was discovered, they examined the crate but did not remove the machine from the crate to examine it. Mr. Hill testified that they rebuilt the crate around the Machine.

Wayne Smith, who used to work for the company that became Plaintiff, also testified during the offer of proof. Mr. Smith testified that he has worked for various companies holding positions such as project engineer, engineering consultant, and engineering services manager. Mr. Smith testified that he has supervised and inspected welding on all of his jobs and that he did a "considerable amount of work with the color makers and color matchers at [one job]." Mr. Smith testified that he examined the Machine and testified:

> I looked for obvious signs that would indicate that maybe the machine had been spot-painted after the welding repair had taken place and I did not see a difference in the paint color, something we might call "aging" of the paint, the texture of the paint and so forth. I didn't see any obvious burned areas of the paint that would have taken place during a welding process or during the subsequent grinding or, or sanding of the weld to smooth it down. My conclusion was that it had been performed before the machine was painted.

Mr. Smith further testified:

> Unless you had a container of the original paint that it had been painted with, it would have been very difficult to match the paint color in my opinion, plus there would have been a noticeable difference in the freshness or the newness of that particular part of the machine.

When questioned, Mr. Smith admitted that he inspected the machine only once in August of 2003, and also admitted that the entire Machine could have been repainted while at Plaintiff's site.

Mr. Fratturo testified during the offer of proof that he too had some additional items of damage to add to his estimate. Mr. Fratturo testified: "There was a broken main power, electrical power switch and a bent bracket for a guard and a few extra labor hours that I added. It's approximately about $400 more." Mr. Fratturo testified there were no changes to his estimates for the sewer. Mr. Fratturo further testified that he has seen machines "in the field running with welded legs."

The Trial Court entered a Final Judgment on November 3, 2004 [1], incorporating

**1.** There are two Final Judgments in the record, one filed on November 3, 2004, and one filed on November 10, 2004. The judgments are substantively the same and, as the November 3 judgment was signed by the trial judge and approved for entry with the signatures of

the Trial Court's order entered October 13, 2004, and finding and holding, *inter alia*, that Plaintiff was responsible for $10,000 worth of damage to the Machine to be reduced by the $5,000 in uncontested damages as previously ordered, with a resulting judgment for Plaintiff against Defendant in the amount of $70,000. In its October 13 order, the Trial Court stated:

The Court finds from the testimony of the parties, the admitted exhibits and from the record as a whole as follows:

1. Pursuant to the Court requesting further proceedings in regard to "... what sum, if any, would be necessary to restore the machine to its pre-storage condition," Defendant presented its expert, Dennis Graham, and Plaintiff presented its expert, Frank Forturo.[2] The parties presented other witnesses on damages or damage related issues. The Court weighs the expert testimony on damage in favor of Frank Forturo in consideration of the evidence in this cause in that:

(a) Forturo has extensive experience in book binding equipment repair including automation, installation, repair and rebuilding machines including connecting feeders and sewers of the same or similar make as the equipment at issue in this proceeding. Graham testified that he had no prior experience in book binding equipment except during the course of his dealings with the Defendant in rebuilding three Model 12 Smyth sewers and in assisting in the design and machining of the parts for the machine subject of this litigation.

(b) Forturo was familiar with the market for used Smythe sewers and feeders whereas Graham was not familiar with the market for used sewers and feeders. Both machines were used machines reconditioned by Defendant to fulfill Plaintiff's need for an automatic feeder which would increase production speed while binding Bible stock at speeds of 80 c.p.m. or better as previously found by the Court in its Memorandum Opinion. The sewer was furnished by Plaintiff and Defendant provided the feeder.

(c) Forturo was completely independent of the transaction between the parties up until the time he was requested to evaluate the cost of repair after the Court issued its Memorandum Opinion November 22, 2002, whereas Graham had a prior business relationship with the Defendant during the course of the design and construction of the subject machine prior to the shipment to the Kingsport, Tennessee facility and this litigation being instituted by Plaintiff.

2. The machines, after being secured in a wooden crate and transported to one of Plaintiff's warehouses, were struck by a forklift which caused damage to the sewer and no damage to the feeder. Forturo's testimony evaluating the cost of repair, based upon his experience in the industry and the nature and

the attorneys for both parties, we are unable to determine why the November 10 judgment was filed. The notice of appeal was filed timely per either judgment and the fact that there are two judgments in the record has no bearing on the issues involved in this appeal.

**2.** Plaintiff's expert's name appears in the record on appeal spelled at times as 'Fratturo' and at other times as 'Forturo.' We are un-

able to determine, given the record before us, the correct spelling. However, motions and other documents filed by Plaintiff use the spelling 'Fratturo.' We, therefore, refer to Plaintiff's expert as Mr. Fratturo. When we quote a portion of the record, we utilize the spelling of Plaintiff's expert's name as it appears in the original.

quality of the machines subject to this litigation, is more credible than the testimony of Graham who in summary desires to dismantle and reconstruct the machine largely with new parts as opposed to pre-storage condition, at a total cost of $96,814.24 (including cost of a frame being recast and machined), a sum significantly in excess of that damage testified to by Defendant's owner in its testimony of August 2002 previously rejected by the Court. The damage to the sewer is that damage testified to by Forturo which generally includes the saddle plate, bracket, shaft, program box, and oxidation due to exposure to atmospheric oxygen and water vapor. The Court finds that the signature (Plaintiff's Exhibit 53) has minimal damage from moisture and that the evidence does not support Graham's contention that the signature was not in the machine at the time of storage.

3. The Court rejects the Defendant's contentions, in its offer of proof, to the effect that there was a total loss of the value of the machine due to one of the sewer's legs being cracked and twisted as a result of the impact with the forklift and that if the sewer cannot be sold, that you cannot sell the feeder alone. Defendant's expert Graham further testified that the machine was a total loss of value and that there was no salvage value. Graham also ruled out buying a used frame due to the possibility of it being bent or not being found.

4. Plaintiff's theory is that the leg was not broken or welded when it left the Plaintiff's facility, therefore, the damage occurred elsewhere. If necessary, a used sewer frame could be purchased. The Court finds that Defendant failed to carry its burden of proof that the frame's leg was cracked and twisted while in Plaintiff's facility or while in storage. Plaintiff's employees Andy Al-

tieri and Brian Hill testified as to no welds, modifications or removal of parts being authorized nor made. Wayne Smith, who is not an employee of Plaintiff and has extensive experience as a welding inspector, repair and maintenance, opined that the weld was done *before* the machine had been painted as he found no difference in the paint color or texture, found no burned areas on the paint, and found no sanding of the weld to smooth it down. He further testified that as the paint color was consistent for all the machine, that unless you had the original container of paint, it would be difficult to match the color and the paint did not appear to be fresher paint.

5. Plaintiff has made no modifications, alterations or repairs to the machines while they were in its possession.

### *Discussion*

Although not stated exactly as such, Defendant raises four issues on appeal: 1) whether the Trial Court erred in interpreting the Settlement Agreement; 2) whether the Trial Court erred by not holding that Plaintiff breached the Settlement Agreement making Defendant's performance impossible; 3) whether the Trial Court erred in determining the amount of damages; and, 4) whether the Trial Court improperly excluded evidence regarding damages. Plaintiff raises two additional issues, which we restate as: 1) whether the evidence preponderates against the Trial Court's finding that Defendant breached the warranties in the original agreement between the parties; and, 2) whether the Trial Court erred by failing to award Plaintiff discretionary costs.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R.App. P. 13(d);

*Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn.2001).

We first address whether the Trial Court erred in interpreting the Settlement Agreement. In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.,* 78 S.W.3d 885, 889–90 (Tenn.2002)(citing *Guiliano v. Cleo, Inc.,* 995 S.W.2d 88, 95 (Tenn.1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.,* 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts,* § 24.30 (rev. ed.1998)); *Doe v. HCA Health Servs. of Tenn., Inc.,* 46 S.W.3d 191, 196 (Tenn.2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.,* 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am.Jur.2d, *Contracts,* § 245).

This Court's initial task in construing the Settlement Agreement at issue, as was the Trial Court's, is to determine whether the language of the contract is ambiguous. *Planters Gin Co.,* 78 S.W.3d at 890. If the language is clear and unambiguous, the literal meaning of the language controls the outcome of the dispute. *Id.* A contract is ambiguous only when its meaning is uncertain and may *fairly* be understood in more than one way. *Id.* (emphasis added). If the contract is found to be ambiguous, we then apply established rules of construction to determine the intent of the parties. *Id.* Only if ambiguity remains after applying the pertinent rules of construction does the legal meaning of the contract become a question of fact. *Id.*

To begin, we note that the parties stipulated that paragraph 3 of the Settlement Agreement is the relevant paragraph as to when the Machine was to be shipped back to Defendant. Specifically, at the beginning of the trial, Plaintiff's attorney stated that the parties would stipulate "the machine was not supposed to be shipped to South Carolina to [Defendant's] facility until [Defendant] had run some samples and—and had—their lawyer had made a report to me." When the Trial Court asked Defendant's attorney if that was stipulated, Defendant's attorney responded: "That's stipulated, Your Honor. That's—that's in Paragraph 3 of the settlement agreement." Paragraph 3 of the Settlement Agreement provided:

3. [Defendant's attorney] will inform [Plaintiff's attorney] if, at the end of the seven (7) day period described in Section 2 above, [Defendant] has the ability to make the improvements to the sewing machines necessary to allow the MAC automatic feeder feed the various types of book stock as required by [Plaintiff]. If [Defendant's attorney] informs [Plaintiff's attorney] that [Defendant] does have said ability, [Plaintiff] will ship its sewing machine to [Defendant] at [Defendant's] expense, and [Defendant] will

have one hundred twenty (120) days within which to complete its work on the machine.

■ We find no ambiguity in paragraph 3 of the Settlement Agreement. Under paragraph 3 of the Settlement Agreement, it clearly was the intent of the parties that Plaintiff's obligation to ship the Machine was not triggered until Defendant's attorney notified Plaintiff's attorney that Defendant had the ability to make the modifications to the Machine so that the feeder would "feed the various types of book stock as required by [Plaintiff]."

Defendant takes the position that it notified Plaintiff, through the parties' attorneys, that "the samples would, in general, run ...." However, the evidence shows, as found by the Trial Court, that Defendant actually notified Plaintiff that Defendant was unable to run several of the samples that Plaintiff provided.

The evidence shows that Plaintiff sent Defendant samples of the different types of book stock that Plaintiff expected to run on the Machine and sent such samples on two occasions. The evidence further shows that in its report regarding the running of the samples, Defendant stated it had problems running several of the samples and recommended extra work to make the samples run correctly including such things as tip-ons or changes in format. Plaintiff's vice president and division manager, Mr. Cooper, testified that changing the format was not a viable alternative as it would require "restripping, impositions, additional paper to the customer, additional processes throughout the plant and by and large Bible customers dictate the imposition and the format that they want these Bibles run in." The evidence shows that Plaintiff reasonably interpreted the notice from Defendant to mean that Defendant did not have the capability to make improvements to the Machine so

that the feeder would "feed the various types of book stock as required by [Plaintiff]."

In its November 22, 2002 Memorandum Opinion, the Trial Court found that the notification from Defendant and its attorney to Plaintiff's attorney "did not inform [Plaintiff's attorney] that [Defendant] had the ability to make the improvements to the sewing machine as necessary to allow the Mac automatic feeder to feed the various types of book stock as required by [Plaintiff] ...." The evidence does not preponderate against this finding. As Plaintiff was not notified that Defendant had the ability to make improvements to the Machine to allow the feeder to "feed the various types of book stock as required by [Plaintiff] ...," Plaintiff's obligation to ship the Machine to Defendant never was triggered. We affirm the Trial Court's interpretation of the Settlement Agreement.

We next consider whether the Trial Court erred by not holding that Plaintiff breached the Settlement Agreement making Defendant's performance impossible. Defendant argues, in part, that Plaintiff breached the Settlement Agreement by not shipping the Machine and also by not providing adequate samples. Defendant's appellate brief asserts that "[t]he agreement simply doesn't say that [Defendant] had the obligation to 'do everything we send him.'" As we have already discussed fully, Plaintiff's obligation to ship the Machine to Defendant never was triggered, and we need not discuss that point further.

■ As for Defendant's assertions about inadequate samples, the record is devoid of evidence showing that the samples that Plaintiff sent to Defendant were atypical of the type of work that Plaintiff intended to run on the Machine when it contracted with Defendant for the pur-

chase of the Machine. Paragraph 2 of the Settlement Agreement clearly provided that Defendant would have seven days to determine whether it could make its feeder attached to Plaintiff's sewing machine "feed the various types of book stock which [Plaintiff] has supplied as samples." Although Defendant claims that some of the samples were missing endpapers and that these missing endpapers could be significant, Defendant's report shows that Defendant had problems wholly independent of missing endpapers. Defendant's report shows that Defendant had problems running glossy sheets, a map, and an 8–page signature. Even if the missing endpapers were significant to the sample run, Defendant's report showed that Defendant was unable to run the samples for other reasons. The evidence does not support Defendant's assertion in its appellate brief that had Plaintiff provided endpapers for some of the samples, then Defendant could have made the Machine operate as promised.

Defendant also argues that Plaintiff sent items as samples that were not actually "Bible stock." However, the evidence shows that the items Plaintiff sent as samples were all parts of Bibles that Plaintiff produced. Plaintiff entered into the contract to purchase the Machine to use to bind Bibles. If Defendant was unable to run the samples that Plaintiff provided, and Defendant indicated that it was unable to do so, then the Machine would "not process the range of book stock desired by [Plaintiff], . . ." or, at the very least, was otherwise not acceptable to Plaintiff and, as provided under paragraph 4 of the Settlement Agreement, Plaintiff was entitled to a refund of the purchase price.

Defendant's appellate brief also argues that the term "book stock" in the Settlement Agreement was ambiguous and states: "In effect, when [Defendant's at-torney] exchanged correspondence with [Plaintiff's attorney] on May 21, 1999, he was telling [Plaintiff's attorney] that the 'book stock' (which term was not defined in the settlement agreement), was not what [Defendant] anticipated and thus the term was ambiguous." Defendant's appellate brief also argues: "Obviously, then there was an ambiguity with regard to what both parties determined to be 'samples' and the trial court should have accepted the testimony of [Defendant's attorney] and McFarland with regard to why the samples were deficient."

The evidence shows that Plaintiff provided to Defendant samples of typical Bible work that Plaintiff produced and that it was this type of work that was intended to be run on the Machine had it performed as promised. Whether the samples were of a type Defendant, after the fact, says were not "anticipated" by Defendant matters much less than what the parties agreed to. As agreed to in the Settlement Agreement, the items sent as samples were what the Plaintiff regularly used in its production of Bibles and were the book stock Plaintiff desired to run on the Machine. This was the clear intent of the parties in the Settlement Agreement. The Trial Court found that Defendant failed to prove that the samples were not adequate and the evidence does not preponderate against this finding. The Trial Court found no ambiguity in the term "book stock" in the Settlement Agreement, nor does this Court.

Defendant attempts to bolster its argument that an ambiguity exists by asserting that "even [Plaintiff's attorney] and [Defendant's attorney] agreed that there were inconsistencies in the agreement." Defendant refers to the deposition of Defendant's attorney in which the attorney agreed that there was an inconsistency between paragraphs 1 and 3 of the Settlement Agreement regarding when the Ma-

chine was to be shipped. This inconsistency, however, was dealt with when the parties stipulated at the beginning of trial that paragraph 3 was the dispositive paragraph regarding the fact that the Machine was not to be shipped until Defendant had given Plaintiff specific assurances. As such, this inconsistency in no way supports Defendant's assertion that there is an ambiguity in the Settlement Agreement regarding the samples that Plaintiff was to send.

Defendant's appellate brief also argues: "It must be remembered that [Defendant's] tests were not run on *the* machine that [Plaintiff] had. It was implicit in the agreement that [Defendant] had to have the actual machine and correct brook (sic) stock to adequately do the testing required by the agreement." Unfortunately for Defendant, the Settlement Agreement did not provide that Defendant had to have the Machine to do the testing. As discussed fully above, Plaintiff's obligation to ship the Machine to Defendant was not triggered until after Defendant ran the samples and gave assurances to Plaintiff of Defendant's ability to make improvements to the Machine to allow the feeder to "feed the various types of book stock as required by [Plaintiff]."

█ It is not the role of this Court "to make a different contract than that executed by the parties." *Posner v. Posner*, No. 02A01–9710–CV–00249, 1997 WL 796216, at *2–3, 1997 Tenn.App. LEXIS 930, at *6 (Tenn.Ct.App. Dec.30, 1997), *no appl. perm. appeal filed. See also, e.g., Central Drug Store v. Adams*, 184 Tenn. 541, 201 S.W.2d 682 (1947). "In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought to be harsh or unjust." *Tenpenny v. Tenpenny*, No. 01–A–01–9406–CV–00296, 1995 WL 70571, at *6, 1995 Tenn. App. LEXIS 105, at *15 (Tenn.Ct.App. Feb.22, 1995), *appl. perm. appeal denied July 3, 1995*.

We find Defendant's issue regarding whether the Trial Court erred by not holding that Plaintiff breached the Settlement Agreement making Defendant's performance impossible to be without merit.

We next address whether the Trial Court erred in determining the amount of damages. We begin by noting that in its October 13, 2004 order the Trial Court made very specific credibility determinations. The Trial Court stated that it "weighs the expert testimony on damage in favor of [Plaintiff's expert] Frank Fortturo ...." The Trial Court found Mr. Fratturo's testimony to be more credible than that of Defendant's expert, Mr. Graham's, for a variety of reasons. These reasons include the fact that Mr. Fratturo had extensive experience with book binding equipment and Mr. Graham did not, the fact that the sewer and feeder at issue in this case both were used machines and Mr. Fratturo was familiar with the market for used sewers and feeders and Mr. Graham was not, and the fact that Mr. Fratturo was completely independent of the transaction between the parties prior to becoming an expert for Plaintiff while Mr. Graham actually had been involved in the building of the Machine. The Trial Court stated that Mr. Fratturo's testimony regarding the cost of repair was more credible than Mr. Graham's "who in summary desires to dismantle and reconstruct the machine largely with new parts as opposed to pre-storage condition ...." The Trial Court also found that other evidence introduced in this case supported Mr. Fratturo's damage evaluation especially the signature found in the Machine, which shows minimal damage from moisture.

█ "When a trial court has seen and heard witnesses, especially where issues of

credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn.1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998)).

 The evidence does not preponderate against the Trial Court's findings relative to damages, particularly given the Trial Court's very specific and detailed findings regarding credibility, which we accord great deference. In addition, we note that Defendant's expert, Mr. Graham, opined during the hearing that the damages totaled $68,655.72, and later during the offer of proof, opined that the correct amount of damages including items excluded by the Trial Court was actually $96,814.24. The evidence shows that Defendant sold Plaintiff the Machine for $75,000. We cannot help but note that Mr. Graham's assertions that the cost to repair the Machine to its pre-storage condition would equal nearly the initial cost of the Machine, or once the additional evidence was considered, in excess of $20,000 *more* than the initial cost of the Machine.

Defendant also raised an issue regarding whether the Trial Court improperly excluded evidence regarding damages. Defendant's appellate brief asserts that had the Trial Court not excluded the testimony of Mr. McFarland and Mr. Graham given during the offer of proof, this evidence "would have clearly shown the damage to be the amount insisted upon by [Defendant]."

We are a bit puzzled as to why Defendant makes this assertion as the Trial Court specifically stated in its October 13, 2004 Order that it considered the evidence given during the offer of proof in reaching its decision. Specifically, the Trial Court stated that: "The Court rejects the Defendant's contentions, in its offer of proof, to the effect that there was a total loss of the value of the machine due to one of the sewer's legs being cracked and twisted as a result of the impact with the forklift and that if the sewer cannot be sold, that you cannot sell the feeder alone." The Trial Court also found that Defendant had failed to carry its burden of proof that the frame's leg was cracked and twisted while in Plaintiff's facility or while in storage. Clearly, and as stated, the Trial Court did consider the testimony given by Mr. McFarland and Mr. Graham during the offer of proof and still found that Defendant had failed to carry its burden of proof on this issue. We find this issue to be without merit. We affirm the Trial Court's determination of the amount of damages to the Machine.

 We next turn to Plaintiff's issue regarding whether the evidence preponderates against the Trial Court's finding that Defendant breached the warranties in the original agreement between the parties. In its January 6, 2003 judgment the Trial Court found and held, *inter alia*, that the parties had entered into the Settlement Agreement and had undertaken to perform that agreement thereby extinguishing the underlying agreement for the purchase of the Machine. The evidence does not preponderate against the Trial Court's findings relative to this issue. We hold, as did the Trial Court, that the Settlement Agreement, which the parties had undertaken to perform, extinguished the underlying agreement for the purchase of the Machine. We find this issue to be without merit.

 Finally, we consider Plaintiff's issue regarding whether the Trial Court erred by failing to award Plaintiff discretionary costs. Defendant's reply brief on appeal argues that Plaintiff "cannot now address this issue as it filed no notice of

appeal with respect to the trial court's denial of [Plaintiff's] request for discretionary costs. That issue is not before this Court for review."

Rule 13 of the Tennessee Rules of Appellate Procedure provides, in pertinent part:

**Rule 13. Scope of Review.**—(a) Questions of Law that May Be Urged on Appeal.—Except as otherwise provided in Rule 3(e), any question of law may be brought up for review and relief by any party. Cross-appeals, separate appeals, and separate applications for permission to appeal are not required. . . .

Tenn. R.App. P. 13. Thus, Plaintiff's issue is properly before this Court for review.

■■■ We review a Trial Court's decision to award discretionary costs for abuse of discretion. *E.g., Massachusetts Mut. Life Ins. Co. v. Jefferson,* 104 S.W.3d 13, 32 (Tenn.Ct.App.2002).

Plaintiff filed a motion for discretionary costs pursuant to Tenn. R. Civ. P. 54.04, which provides, in pertinent part:

Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs. . . .

Tenn. R. Civ. P. 54.04(2).

After a thorough review of the record on appeal, we find that Plaintiff is entitled to an award of discretionary costs. We reverse the Trial Court's January 4, 2005, order denying discretionary costs and remand this issue to the Trial Court for a determination of the proper amount of discretionary costs.

We affirm the remainder of the Trial Court's judgment with one modification. Defendant is entitled to the Machine, if it so chooses, and to have the Machine shipped to Defendant at its expense as the parties provided in paragraph 4 of the Settlement Agreement. If Defendant chooses to have the Machine returned to it, it shall notify Plaintiff in writing within 30 days of our judgment becoming final. Plaintiff then will have 30 days after receiving such written notification to ship the Machine to Defendant at Defendant's expense. If Defendant does not notify Plaintiff in writing of its desire to have the Machine shipped to Defendant at Defendant's expense within 30 days of our judgment becoming final, then Plaintiff may keep the Machine and may use or dispose of it at its discretion.

### Conclusion

The judgment of the Trial Court is (1) reversed on the issue of discretionary costs; (2) modified to order that Defendant is entitled to the Machine and to have the Machine shipped to Defendant at Defendant's expense upon timely written notification to Plaintiff; and (3) the remainder of the judgment of the Trial Court is affirmed as so modified. This cause is remanded to the Trial Court for a determination of the proper amount of discretionary costs and for collection of the costs below. The costs on appeal are assessed against the Appellant, L & B Manufacturing Company, and its surety.