IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 2, 2009 Session

## CHARLOTTE BRANSON v. JOYCE FITZGERALD, d/b/a REALTY EXECUTIVES OF KINGSTON

Appeal from the Chancery Court for Roane County
No. 15494    Frank V. Williams, III, Chancellor

No. E2008-02775-COA-R3-CV - FILED DECEMBER 4, 2009

Charlotte Branson ("Plaintiff") sued Joyce Fitzgerald, d/b/a Realty Executives of Kingston with regard to real estate commissions for several specific transactions. After a trial, the Trial Court entered an order finding and holding, *inter alia*, that Plaintiff was entitled to a judgment against Ms. Fitzgerald for the commissions on three of the transactions. Ms. Fitzgerald appeals to this Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;
Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Heather G. Anderson, Knoxville, Tennessee for the Appellant, Joyce Fitzgerald, d/b/a Realty Executives of Kingston.

Jack H. McPherson, Jr., Kingston, Tennessee for the Appellee, Charlotte Branson.

**OPINION**

## Background

Plaintiff is a real estate broker. She was an affiliate broker from 1995 to 2000, and since 2000 has been a broker. At the time of trial, Plaintiff owned ERA Executive Choice Real Estate, which she started in March of 2005. Prior to starting her own company, Plaintiff worked as an affiliate broker or sales associate for Realty Executives of Kingston ("Realty Executives"). Defendant Joyce Fitzgerald was the principal broker for Realty Executives. Plaintiff left Realty Executives in February of 2005 and later filed this lawsuit seeking commissions on several specific transactions identified in Plaintiff's Complaint as the Hartford Village Way ("Hartford"), Dyllis Road ("Dyllis"), River View Lane ("River View"), Pin Oak Road ("Pin Oak"), Squaw Valley Road ("Squaw Valley"), Anglewood Drive ("Anglewood"), and Pine Ridge Road ("Pine Ridge") transactions. The case proceeded to trial without a jury.

Plaintiff testified at trial that she had a written independent contractor agreement with Realty Executives in 2000, 2002, and 2003. Plaintiff could not recall having such a written agreement with Realty Executives for 2001. The independent contractor agreement between Plaintiff and Realty Executives for 2003/2004 provided, in pertinent part:

> Effective dates of Agreement: __2/23/03__ to __2/23/04__
>
> Parties to the agreement: Realty Executives of Kingston and __[Plaintiff]__
>
> The following commission plan will remain in effect for the dates stated above. The agent will receive 100% of all commissions earned during the effective dates of this agreement. There will be no franchise fee. Associate may do real estate business as an agent with Realty Executives of Kingston in exchange for the following:
>
> $350 per month office association fee
> $350 processing fee per transaction
>
> > Agent will be billed a minimum of 12 processing fees during the year. In order to be eligible to participate in 100% program for the following year, agent will do a minimum of 20 transactions for the dates stated above. On commissions less than $1,000, agent will only be billed half a processing fee ($175.00).

Under the independent contractor agreement, Plaintiff also was required to pay for items such as her own sign frames, long-distance telephone calls, advertising, an answering service, and a website fee. Plaintiff testified that she was not presented with a proposed independent contractor agreement for 2004/2005 until after she had left Realty Executives. The parties, however, continued to operate in the same manner during 2004 as they had during 2003.

In February of 2005, Ms. Fitzgerald signed a Tennessee Real Estate Commission Form 1 ("T.R.E.C. Form 1") for release of license in order to release Plaintiff's license from Realty Executives to allow Plaintiff to work elsewhere. Ms. Fitzgerald signed the T.R.E.C. Form 1 on

February 24, 2005, and then crossed out this date, inserted the date of February 27, 2005, and initialed the form near the new date. Ms. Fitzgerald explained that she marked through the date of February 24 on the T.R.E.C. Form 1 because Realty Executives had asked Plaintiff to come in to sign the form, but Plaintiff did not come in until February 27. Plaintiff received the T.R.E.C. Form 1 from Realty Executives on February 28, and sent it to the Real Estate Commission in Nashville to transfer her license to her new firm. She was notified on March 7, 2005 that her license had been transferred.

Plaintiff moved her furniture and personal items from Realty Executives' office on February 27, 2005, which was a Sunday. Plaintiff testified that she called Ms. Fitzgerald and asked to talk to her and was told to come to the office after 5:00 on February 28, which Plaintiff did. Plaintiff testified that she told Ms. Fitzgerald that she had a listing for a relative and asked if Realty Executives would release that listing and Ms. Fitzgerald agreed to do so. Plaintiff also told Ms. Fitzgerald that she was in the process of negotiating on the River View property and asked if Realty Executives would allow her to continue to negotiate. Plaintiff testified that Ms. Fitzgerald gave Plaintiff permission to do so. Plaintiff also asked if she would be paid for Riverview and stated Ms. Fitzgerald told her "yes."

Plaintiff testified that she was actively working on the River View transaction at the time she received the T.R.E.C. Form 1 from Realty Executives. Plaintiff listed the River View property from June 7, 2004 to April 31, 2005. Plaintiff testified that the seller of the River View property was Heidi Sullivan. After she listed the River View property, Plaintiff advertised it, paid for the advertising, showed the property, and coordinated having other agents show the property. Plaintiff received inquiries about the River View property from an agent in Oak Ridge and one in Sweetwater.

Plaintiff testified that the offer for River View was signed on March 2 in Sweetwater, Tennessee and was faxed to Plaintiff. Plaintiff took a copy of the contract to Realty Executives. Plaintiff testified that she met the people at the River View property so that a home inspection could be conducted. After the home inspection, Plaintiff participated in further negotiations on behalf of the seller because "[t]he seawall had broken …." The transaction on River View closed in March of 2005 in Sweetwater, and Plaintiff attended the closing. Plaintiff received the commission check for $12,175.00 at the closing and called Realty Executives to make arrangements for someone from Realty Executives to pick up the check. Plaintiff never was paid anything for the River View transaction.

Plaintiff testified that the Hartford property was one of Plaintiff's listings and a contract was signed on February 22, 2005. The Hartford transaction closed in March of 2005 and Plaintiff attended the closing and received the commission check. She then took the check to Realty Executives.

Plaintiff testified that the Dyllis transaction was one of her buyer transactions. Plaintiff made an offer on behalf of her buyer and secured a contract in February of 2005. The transaction closed in March of 2005. Plaintiff attended the closing and received the commission check. Plaintiff then delivered the commission check and file to Realty Executives.

From the commissions on the Hartford and Dyllis properties Realty Executives deducted for twenty transactions for the year and a $250 processing fee. Plaintiff testified that she never before had seen this processing fee. Plaintiff testified that she did not know that she had to pay for twenty transactions. Her understanding was that she was required to do twenty transactions in the previous year, 2003/2004, which she had done. Plaintiff was paid only $65 for both the Hartford and Dyllis transactions.

Plaintiff explained that Jamie Russell was a friend to whom Plaintiff had shown property and who eventually became Plaintiff's assistant. Plaintiff encouraged Ms. Russell to get her real estate license and become a part of Plaintiff's team. Ms. Russell worked with Plaintiff on the Squaw Valley and Pin Oak transactions as Plaintiff's licensed assistant. Plaintiff testified that she had an agreement with Ms. Russell that Ms. Russell would work with Plaintiff's customers only and Ms. Russell would receive 60% of the commission and Plaintiff would receive 40%. Realty Executives, however, paid Ms. Russell 60% and kept the other 40% for the Squaw Valley and Pin Oak transactions.

Plaintiff testified that for both the Anglewood and Pine Ridge transactions, Ms. Russell received 60% and Plaintiff received 40%. When asked if she had been paid in this manner with regard to transactions involving Ms. Russell any other times, Plaintiff responded: "That's all [Ms. Russell] had ever done. She was a new agent."

When asked, Plaintiff admitted that if an affiliate broker leaves a firm the listings stay with the firm unless they are released. Plaintiff did not ask Realty Executives to release the River View listing to her. She explained: "Because we were in negotiation with it and I felt like it was only fair for [Realty Executives] to make some monies on that, too. I know it was only three hundred and fifty dollars but it was still, it was still the listing that was there at the company."

Jamie Russell testified that the confirmation of agency status sheet for Pin Oak has Ms. Russell listed as the agent. The Squaw Valley confirmation of agency status sheet also lists Ms. Russell as the agent.

Curtis Fitzgerald, the retired co-owner of Realty Executives, testified at trial. Mr. Fitzgerald owned Realty Executives along with his wife, Joyce Fitzgerald. He was licensed as a broker before he retired his license approximately six months before trial. Mr. Fitzgerald testified that Ms. Russell is a new agent and all new agents are under a sixty/forty split plan for the first year. Mr. Fitzgerald testified that he did deviate from this plan with Ms. Russell on a couple of transactions and stated: "I guess I was brain dead that day because there was two transactions involved and I agreed to close them on a one-time deal and I didn't keep any money at all for Realty Executives. I simply split the money between [Plaintiff] and [Ms. Russell], sixty-forty." Those two transactions were the Pine Ridge and the Anglewood transactions. Realty Executives did not keep a transaction fee on those transactions. Mr. Fitzgerald testified that he did not have any agreement to pay Plaintiff and Ms. Russell the split commission for all of Ms. Russell's transactions and stated that he told Plaintiff and Ms. Russell this more than once. When asked why he distributed those two transactions against what he would normally do, Mr. Fitzgerald replied:

Well, it had been a time since they were closed and I had - - I'm supposed to get my escrow funds straightened out within three days. It had transferred to its proper account and, if I recall, it had been about two weeks or something like this and we couldn't get people in for any kind of an agreement so I just went ahead and closed it out.

When asked to clarify who he meant when he said that he "couldn't get people in," Mr. Fitzgerald stated: "I'm talking about [Ms. Russell]."

Mr. Fitzgerald testified that Plaintiff was on the hundred percent plan where she had to have a minimum of twenty transactions within a contract year. He stated that Plaintiff's contract year was from February 23, 2004 to February 23, 2005 "[a]nd then in '05 you would start a new year. So, she picked up her - - and signed her [T.R.E.C. Form 1 transfer] document on the 27th, so I considered it a new year." Plaintiff did not sign a contract for 2004/2005. Mr. Fitzgerald testified that Realty Executives put a contract in Plaintiff's mailbox and also left one on her desk, but Plaintiff never signed the contract.

Mr. Fitzgerald testified that the total commissions for the Hartford and Dyllis transactions were $7,315 and out of that Plaintiff was paid only $65. When asked how he arrived at that number, Mr. Fitzgerald testified: "The twenty transactions for the year, which is seven thousand dollars, and a two hundred and fifty dollar processing fee. Because I handled them together it was one processing fee for both of them." Mr. Fitzgerald explained that he charged the $250 processing fee because it required more work and more time because the agent wasn't there "to check all the documents and make sure they're there for audit reasons and make sure all the numbers are correct and just, generally, it takes time to make sure everything is there." He admitted that the contracts for the Hartford and Dyllis transactions were signed before Plaintiff left Realty Executives, which was before the end of the contract year, but stated that the commission was earned "[w]hen it closed." He stated: "A transaction is not complete until you get the money. Now, that is the way our office operates."

Mr. Fitzgerald testified that Ms. Russell was the agent for the Pin Oak and Squaw Valley transactions. He also testified that Ms. Russell handled everything on those two transactions.

Mr. Fitzgerald stated that the contract date for the River View transaction was after Plaintiff left Realty Executives, and he did not pay Plaintiff any commission for this transaction. He stated: "she was not - - didn't have a valid license to practice during that period when the contract was approved, when the contract was signed; and it was our listing. It was Realty Executives' listing." Mr. Fitzgerald testified that he never told Plaintiff that she could go ahead and close the River View transaction and would be paid. He admitted that he did not know how the signed contract for River View got to Realty Executives' office. He also did not know if Plaintiff was involved in negotiating the River View contract. Mr. Fitzgerald admitted that he did not know if a home inspection was done on River View, and that neither he nor his wife attended any home inspection for River View. Further, Mr. Fitzgerald did not know if there was a problem with the River View seawall after a home inspection. He admitted that Plaintiff and Ms. Fitzgerald both attended the River View closing.

-5-

Joyce Ann Fitzgerald testified that she has been with her business, Realty Executives, for approximately thirteen years and that she is the principle broker. She testified that Realty Executives never agreed to the arrangement that Plaintiff had with Ms. Russell and that Plaintiff was informed of this.

Ms. Fitzgerald stated that she never gave Plaintiff permission to go ahead and close the River View transaction and never agreed to pay Plaintiff for this transaction. Ms. Fitzgerald testified that she has allowed other agents who have left Realty Executives to close transactions if the contract had been executed prior to the agent's leaving and admitted that in such a case the agent would be paid for the transaction.

Ms. Fitzgerald was asked if typically Realty Executives took the $350 transaction fee from each transaction as the transaction occurred or if the sum of $7,000 to cover the fees for twenty transactions was taken from the first commission earned during the contract year. She testified that the $350 transaction fee would have been taken by Realty Executives from each transaction as it occurred for a broker who was expected to remain with Realty Executives and that the fee for twenty transactions was taken as a lump sum from the Hartford and Dyllis transactions because they knew that Plaintiff would not be with Realty Executives for the remainder of the contract year.

After trial, the Trial Court entered its Decree on August 27, 2008 incorporating by reference the Trial Court's findings of fact. The Trial Court specifically found and held, *inter alia*:

First of all, dealing first of all with Squaw Valley and Pin Oak; I agree with [Ms. Fitzgerald] on those issues, because Jamie Russell was listed as the agent on those transactions and this agreement that the plaintiff had with Jamie Russell was not an agreement that was had with Realty Executives. And if the plaintiff has an issue with those two transactions then it is, it seems to me, with Jamie Russell and not with Realty Executives. And so, I'm finding for [Ms. Fitzgerald] on those issues. I thought I would address those first.

My attitude, however, is a little different with regard to these other things. First of all, and I was trying to get this clear in my own mind and trying to think how this, the mechanics of how this arrangement might work is what led me to ask the questions about how the plaintiff would have been paid in the 2003/2004 time frame when obviously she was paid with each transaction that came in all one hundred per cent of the commissions and the only thing that Realty Executives would have received during each month would have been for each of those transactions, the three hundred and fifty dollar processing fee and the three hundred and fifty dollar office fee, plus the other miscellaneous expenses and things of that sort. And it was only because they knew that she was leaving the firm in February of 2005 that they accelerated, shall we say, her obligation to pay the three hundred and fifty dollars times twenty, or seven thousand dollars, for twenty transactions.

I would have to say, first of all, that it seems to me that there was no signed contract, that there was simply an operation that had been going on that was unsigned

by the plaintiff.  And it appears that the obligation to pay - - and not obligation, but the willingness of the defendant [sic] to pay that three hundred and fifty dollars on each transaction was based upon their prior experience and that when you look at the addendum to Exhibit Number One, it seems that - - well, if you just read it here:

> "The following commission plan will remain in effect for the dates stated above, the agent will receive one hundred percent of all commissions earned during the effective dates of this agreement. There will be no franchise fee.  Associate may do real estate business as an agent with Realty Executives of Kingston in exchange for the following: three hundred and fifty dollars per month office associate fee and three hundred and fifty dollar processing fee per transaction. Agent will be billed a minimum of (and you can substitute) twenty processing fees during the year in order to be eligible to participate in one hundred percent program for the following year.  Agent will do a minimum of twenty transactions for the dates stated above.  On commissions less than one thousand dollars agent will only be billed half a processing fee of a hundred and seventy-five dollars.  So that in order to be eligible for the next year for the hundred percent program for the following year agent will do a minimum of twenty transactions for the dates stated above.["]  (Reading)

That says to me that in order to be eligible for this hundred percent program during the following year she would have had to have done a minimum of twenty transactions for the dates stated above.  And it just, it seems like to me that her right to receive the hundred percent commission had been triggered by the fact that she had done, even if we assume that this was a binding agreement, that she had signed it, that she had consented to it in some way, had been earned by the fact that she had done her twenty, the minimum of twenty transactions during the previous year.  That entitled her to get one hundred percent less the three hundred and fifty dollar processing fee for each transaction.

So, I'm inclined to agree with the plaintiff on the Hartford and Dyllis transactions and that it appears to me also that she was the one that earned the fee on the Riverview Lane transaction, even though it was not consummated until after she had left.  She's the one that even later is the one that carried out the transaction, that attended the closing, that did all of the other things.  She said that Ms. Fitzgerald agreed to it.  Ms. Fitzgerald denies that.  I simply think that it's a matter of looking at who did the work, and in this case the plaintiff did the work.  She's entitled to get paid for it and that's more or less how I'm looking at it.  So, I'm finding for the plaintiff as to the Hartford, Dyllis, and Riverview transactions, and for [Ms. Fitzgerald] as to the other two previously mentioned transactions.

The Trial Court awarded Plaintiff a judgment against Ms. Fitzgerald for the commission of $12,172 for River View, a judgment against Ms. Fitzgerald for the commission of $2,320 for Dyllis, and a judgment against Ms. Fitzgerald for the commission of $4,995 for Hartford.

Ms. Fitzgerald filed a motion to alter or amend. After a hearing, the Trial Court granted the motion to alter or amend in part and denied it in part. Specifically, the Trial Court amended its judgment to deduct three $350 transaction fees, one for each of the transactions for which Plaintiff was awarded a judgment, from the judgment total amount reducing the total judgment by $1,050. Ms. Fitzgerald appeals to this Court.

### Discussion

Although not stated exactly as such, Ms. Fitzgerald raises one issue on appeal: whether the Trial Court erred in finding that Plaintiff was entitled to a judgment against Ms. Fitzgerald for the commissions from the River View, Dyllis, and Hartford transactions.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

As this Court explained in *Quebecor Printing Corp. v. L & B Mfg. Co.*:

> In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)(citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998)); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am. Jur. 2d, *Contracts*, § 245).

*Quebecor Printing Corp. v. L & B Mfg. Co.*, 209 S.W.3d 565, 578 (Tenn. Ct. App. 2006).

The evidence in the record on appeal shows, all as found by the Trial Court, that Plaintiff had an agreement with Realty Executives wherein, in pertinent part, if Plaintiff completed twenty or more transactions within a contract year then Plaintiff was entitled to participate in the 100% program for the following year. The evidence further shows that Plaintiff did complete twenty or more transactions during the year prior to the transactions at issue in this case. The evidence also shows that the parties continued to operate under the same terms as contained within the written contract agreement even though Plaintiff had not executed a new written agreement for 2004/2005. The evidence does not preponderate against these expressed or necessarily implied findings by the Trial Court.

Ms. Fitzgerald argues on appeal, in part, that Plaintiff is not entitled to the commissions on the Hartford and Dyllis transactions because "[Plaintiff] had no vested right in the commissions as they were not earned until the closing." The evidence in the record on appeal shows that the contracts for the Hartford and Dyllis transactions were signed before Plaintiff left Realty Executives, but that the closings for these transactions did not occur until after Plaintiff had left Realty Executives.

The contract between the parties does not specifically define when a commission is earned. As such, we must apply the "usual, natural, and ordinary meaning" of the words to determine the parties' intent. *Id.* at 578. Our Supreme Court has addressed the subject of when a real estate commission is earned from the party charged with paying this fee stating:

> [A] broker, who agrees for compensation to procure a purchaser of land, has earned his commission when he effects a valid written contract for sale, upon terms and with a purchaser acceptable to the owner; neither the purchaser's refusal to perform his contract on grounds not imputable to the broker's fault, nor the voluntary failure of the vendor to compel him to do so, will defeat the broker's claim for commission.

*Dobson & Johnson, Inc. v. Von Weiland*, 644 S.W.2d 394, 396 (Tenn. 1982). Thus, the commission is earned from the party who is charged with paying the commission at the time of "a valid written contract for sale, upon terms and with a purchaser acceptable to the owner…." *Id.*

Ms. Fitzgerald argues on appeal, in part, that in prior years Plaintiff was not paid her commission until after the closing took place and that "[e]ven under the contract which governed [Realty Executives'] and [Plaintiff's] relationship in prior years, the commissions were not generated until the essential commission-generating-closing took place." Ms. Fitzgerald cites to an unreported Minnesota Court of Appeals case in support of her assertion that the commission generating event was payment to the employer. This unreported Minnesota case, however, clearly carries no precedential weight, and we decline to consider it.

Further, Ms. Fitzgerald has confused the issues of when a commission is earned and when Plaintiff is entitled to be paid the commission. While it may have been the custom and conduct of the parties in prior years for Plaintiff to receive her commission after the closing took place, this fact does not govern when the commission actually was earned. Mr. Fitzgerald asserted

at trial that the commissions could not have been earned until after closing because until then there was no money to pay Plaintiff. He testified: "A transaction is not complete until you get the money. Now, that is the way our office operates." However, as is clear from *Dobson & Johnson, Inc.*, a commission may be earned prior to the date when it must be paid. *See Dobson & Johnson, Inc.*, 644 S.W.2d 394. The Fitzgeralds are merely asserting that Plaintiff was not entitled to be paid the commissions until after the closings had taken place. As the record on appeal reveals that the closings on all of the transactions at issue happened prior to trial, Realty Executives had the money and Plaintiff was, therefore, entitled to be paid as per the parties' established agreement.

Ms. Fitzgerald cites us to nothing else which shows that the commissions were not earned under the parties' contract at the time of contract, but were instead earned at some other time. The Trial Court found that Plaintiff had completed a minimum of twenty transactions for the prior year. The evidence does not preponderate against this finding. Given this, under Plaintiff's contract with Realty Executives Plaintiff was entitled to 100% of the commissions on these transactions minus the $350 per transaction fee. As such, we find no error in the Trial Court's awarding Plaintiff the commissions for these two transactions minus the $350.00 transaction fee for each transaction.

The situation, however, is slightly different for the River View transaction. The contract for the River View transaction was not signed until after Plaintiff left Realty Executives. Plaintiff strongly asserts that she spoke with Ms. Fitzgerald about River View on February 28, 2005 and that Ms. Fitzgerald gave Plaintiff permission to continue to work on the River View transaction and that Ms. Fitzgerald also said Plaintiff would be paid for this transaction. Ms. Fitzgerald just as strongly disagrees with Plaintiff's assertions claiming that she never made these statements. The Trial Court, thus, was required to make a credibility determination with regard to this issue, and it clearly found Plaintiff more credible with regard to the facts surrounding the River View transaction.

In *Wells v. Tennessee Bd. of Regents*, our Supreme Court observed:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

We give great deference to the Trial Court's credibility determinations, and the evidence does not preponderate against the Trial Court's findings with regard to the River View transaction. As such, we find no error in the Trial Court's awarding Plaintiff a judgment for the commission for the River View transaction less the $350.00 transaction fee. We, therefore, affirm the Trial Court's judgment.

## Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Joyce Fitzgerald, d/b/a Realty Executives of Kingston, and her surety.

_____

D. MICHAEL SWINEY, JUDGE